**In re L. M. S. ASSOCIATES, INC., d/b/a Universal Gift Shops, Inc., Debtor.**

**William ROEMELMEYER, Trustee, Plaintiff.**

**v.**

**CAPITAL BANK, a national banking association, Defendant.**

**Bankruptcy No. 81–00574–BKC–JAG.**
**Adv. No. 81–0395–BKC–JAG–A.**

United States Bankruptcy Court, S. D. Florida.

Jan. 20, 1982.

Rudolph F. Aragon, Greenberg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff, P. A., Miami, Fla., for defendant.

Paul G. Hyman, Jr., Britton, Cohen, Kaufman, Benson & Schantz, Miami, Fla., for trustee.

Joel L. Kirschbaum, Esler & Kirschbaum, P. A., Fort Lauderdale, Fla., for claimants.

William Roemelmeyer, Miami Shores, Fla., trustee.

Louis Phillips, Phillips & Phillips, Miami, Fla., for Universal Gift Shops.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

The trustee in this case filed a complaint to determine amount, validity and priority of lien against Capital Bank, a lender of the debtor and the bank counterclaimed for modification of the automatic stay. The facts are essentially agreed to, and the legal issue is whether or not the acts done by Capital Bank were sufficient to perfect its security interest and preserve its priority over the trustee. The trustee consents to a lifting of the automatic stay if the court finds that he does not have priority over the bank.

The debtor is a Florida corporation, with its headquarters in Florida. It operates gift shops aboard cruise ships which sail in the Caribbean and Mediterranean and stop at ports in several countries, primarily *not* in Florida. The ships are all of non-American registry.

Capital Bank made loans to the debtor of $140,000 on August 2, 1979 and of $40,000 on November 23, 1979. The notes were renewed, and the outstanding principal is now $125,734.10 (Defendant's Exhibits A, B, C and D and testimony of David E. Berger, senior vice president of Capital Bank). On August 2, 1979, the debtor entered into a security agreement with Capital Bank covering, among other things, the inventory of the ship gift shops, including after-acquired property (Defendant's Exhibits E, F and G).[1] The bank filed financing statements as to this collateral with the Secretary of State of Florida on August 7, 1979 (Defendant's Exhibits H and I), and with the Dade County Clerk of Court.

As the debtor continued the operation of its business, it would obtain goods and air ship them to the various cruise ships. Most, but not all, of the goods originated in or came through Florida. They were never sent to or kept in any foreign cities, but would be held by customs agents in a given port only for delivery onto a vessel when it arrived in port. Goods continued to be shipped in this manner until four or five weeks before bankruptcy. Approximately a week before the petition in bankruptcy was filed, and in anticipation of it, goods were taken off the S.S. Victoria, S.S. Britannus and S.S. Vera Cruz and placed in a sealed, bonded warehouse in San Juan, Puerto Rico. It is these goods, of a present liquidation value of approximately $75,000—$80,000, which the trustee seeks.

1. There is only one security agreement at issue, although identical security agreements were executed in two corporate names.

The question in this case may be less complex than that in *Fahs v. Martin*, 224 F.2d 387 (5th Cir. 1955), which elicited this comment, at 392:

> This question . . . is anything but simple, and unless our process of reasoning toward its solution is scrupulously methodical, we may overlook a fundamental principle or accept too easy a solution.

However, reaching a correct determination here involves a somewhat tedious process which we resist the temptation to bypass.

■ Although the bank's collateral was kept on ships at all times until bankruptcy threatened, the issue of priority is not within the realm of maritime law. See, e.g. Gilmore and Black, Law of Admiralty (2d ed. 1975); Wright and Miller, Federal Practice and Procedure § 3671, 3675 (1976); 2 Am.Jur.2d, *Admiralty,* § 61, "Maritime Nature of Contract" (1962). Despite the locations of the gift shops, the contract between the bank and the debtor here was not a maritime contract.

Although 11 U.S.C. § 544(a), federal bankruptcy law, gives the trustee the status of a hypothetical lien creditor, the determination of whether or not the trustee has priority over other secured creditors is an issue of state, or non-federal, law. However, where, as here, the secured property, the parties, and the events have connections with more than one state or nation, a conflicts of law problem arises. This poses the question of whether federal, the forum state's—or some other—choice of law rules should be used to resolve the conflicts problem. Before discussing this further, however, it may be useful to generally review the conflicts law of Florida, the forum state.

The Uniform Commercial Code, as adopted in Florida, contains choice of law provisions. Section 671.105(1), Florida Statutes, (UCC 1–105) provides:

> Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this code applies to transactions bearing an appropriate relation to this state.

That, however, is modified by subsection (2)(e) which states that the applicable law (including the conflict of laws rules) specified in § 679.103 (UCC 9–103) (perfection of secured transactions) will control. Section 679.103(1)(b) as amended, effective January 1, 1980, provides that the "perfection and the effect of perfection or nonperfection of a security interest in [goods] are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected".[2] Although the goods in question were mobile, or at least were transportable, and, in fact, transported, they do not fall within the terms of § 679.103(3) because they are not "of a type normally used in more than one jurisdiction . . . [and] equipment or . . . inventory leased or held for lease by the debtor to others . . . ." § 679.103(1)(c), concerning goods which the parties know will be kept in another jurisdiction also is not applicable because it applies to purchase money security interests. The other subsections of § 679.103 are likewise not applicable.

In the present case, the financing statement had been filed prior to acquisition by the debtor of the collateral in question. Therefore, under UCC substantive law, the "last event . . . on which is based the assertion that the security interest is perfected" would be acquisition by L.M.S., UCC 9–303 (§ 679.303, Fla.Stats.) In some cases the goods were located in Florida when they were acquired by L.M.S. but not in all cases. The trustee has also asserted that the security interests became unperfected by being removed from Florida for more than four months. However, he relies on § 679.-

---

**2.** Pursuant to § 671.105, "the law" referred to here includes the choice of law rules, but if the collateral is located in jurisdictions such as Florida, where UCC 1–105 has been adopted, 1–105 is presumably the choice of law rule, and *that* refers once again to 9–103.

103(1)(d), Fla.Stats., which leads to the disperfection of security interests brought *into* Florida, but not the reverse. Since there is no other event which leads to an assertion of perfection or unperfection, under Florida (and UCC) choice of law provisions, this court should look to the substantive law of the respective jurisdictions where each part of the collateral was located when L.M.S. acquired it.

■ Returning to the issue of what choice of law rules to apply, federal courts in diversity cases must apply the conflicts law of the forum state, *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). But where a federal court (and specifically a bankruptcy court) is applying federal law which refers to state law, the commentators conclude that the court is not bound to use the forum state's conflicts law in order to determine which state's internal law to apply. Rather, the court should use federal conflicts rules (its independent judgment) as part of the overall federal law it is applying. See, e.g. 4 Collier on Bankruptcy ¶ 544.02 at 544–11 (15th ed. 1981); 1B Moore's Federal Practice ¶ .322 (2d ed. 1981). Nevertheless, the correct application may be of the forum state's conflicts law, depending on the policies of the federal law which underlie the substantive issues and the nature of the state law being applied, See, e.g., Moore's, at ¶ .325.

The cases shed a small amount of light on the problem. As stated by the Fifth Circuit Court of Appeals in *Woods-Tucker Leasing Corp., etc. v. Hutcheson—Ingram*, 642 F.2d 744, 748 (5th Cir. 1981):

Both the Supreme Court and this circuit have taken care to avoid resolving this question in the context of the Bankruptcy Act. *E.g., Vanston Bondholders Protective Committee v. Green, supra*, 329 U.S. [156] at 161–62, 67 S.Ct. [237] at 239 [91 L.Ed. 162]; *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 371 n.2, 65 S.Ct. 405, 408 n.2, 89 L.Ed. 305 (1945); *Fahs v. Martin*, 224 F.2d 387, 396–97 (5th Cir. 1955); *but cf.*

*In Re Wallace Lincoln-Mercury Co., Inc.*, 469 F.2d 396, 400 n.1 (5th Cir. 1972) ("In this federal bankruptcy case the District Court is not obliged to use the choice-of-law methodology of the forum state. . . .") (dicta)

In fact, the issue has been avoided in other than bankruptcy cases as well. E.g. *International Union v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966) (Labor Management Relations Act).

Of the three Fifth Circuit[3] bankruptcy cases on point which this court has found, the issue was left undecided in *Fahs, supra*, because the court concluded that the same result would be reached by either choice of law process. The substantive issue there was whether a trustee in bankruptcy could deduct accrued interest for income tax purposes, and whether the underlying contract was void as usurious.

The circuit court's conclusion in *Wallace Lincoln-Mercury, supra*, that the district court need not use the forum state's choice of law rules was dismissed as *dicta* by the *Woods-Tucker* court. There the ultimate issue was whether or not a finance company had a lien on the property of the bankrupt car dealer which would give it priority over other creditors. The court examined the connections with the forum state (Louisiana) and concluded that its substantive law was correctly applied.

The court in *Woods-Tucker, supra*, returned to the tradition of not resolving which choice-of-law method should be used. While the issues in that case are the most similar to the case before this court, it differs in certain aspects. In *Woods-Tucker*, a sale and leaseback arrangement was found by the bankruptcy and district courts to be, in actuality, a secured loan governed by the UCC. The loan was then attacked as being usurious. The lease provided that it was to be governed by Mississippi law, while the bankruptcy had been filed in Texas by a Texas debtor. The opinion on rehearing, which vacated the court's previ-

---

**3.** The Eleventh Circuit Court of Appeals adopted the decisions of the Fifth Circuit as its body of precedent in *Bonner v. City of Prichard*, 661 F.2d 1206 (1981).

ous opinion, solely concerned the choice of law issues and whether the parties' choice should be honored.

UCC 1–105(1), having been adopted in Texas, was the forum state's choice of law rule. The court concluded that it would adopt the same rule if it *did* exercise its independent federal judgment because the Uniform Commercial Code should generally be considered as the federal law of commerce. Under UCC 1–105(1) the court upheld the parties' choice of Mississippi substantive law.

It is not quite as easy to reach the conclusion that Florida and federal conflicts law would be the same in the case before this court. First of all, most of the jurisdictions where the collateral was located at various times were non-UCC jurisdictions and this court cannot assume that their law would be the same as that of Florida.

As in *Woods-Tucker*, there was a printed choice of law provision in the security agreement executed August 2, 1979 (Defendant's Exhibits F and G): "¶ 16 This agreement has been delivered in the State of Florida and shall be construed in accordance with the laws of Florida." However, the UCC conflicts provision here is not 1–105(1), which authorizes the parties to designate the applicable law, but 9–103(1)(b) which does not.

The difference between 1–105 and 9–103 is appropriate, because the issue at 9–103 is not one of general commercial law, but specifically of perfection of security interests. *Perfection* does not affect the rights and obligations between a debtor and his secured creditor, but relates to rights among competing creditors or others with interests in the collateral. It defines what notice is necessary to "the world," and without which the secured creditor may not assert his priority interest in the collateral. The concept is inherently connected with the location of the collateral because third parties who are interested in the collateral will most naturally look to the jurisdiction where the collateral is located, for notice of prior interests. There will always be problems, of course, when collateral is moved from one jurisdiction to another. In 9–103 the Uniform Commercial Code has created an intricate framework of choice of law[4] rules to cover situations where various types of collateral are moved for various purposes, to provide the best combination of efficiency in protecting security interests and fair notice to third parties. Since the framework depends on the reciprocal uniform provisions of other UCC jurisdictions, however, it collapses when the collateral is removed to a non-UCC jurisdiction, and may lead to an unfair result.

For example, a security interest might be perfected in jurisdiction A. The collateral is then moved to state B and kept for more than four months without perfection in state B. B has enacted the UCC, including § 9–103(1)(d), which requires that the security interest be re-perfected in B within four months. A court applying the 9–103(1)(b) choice of law provision would choose the internal law of state B because the expiration of the four month period after the removal of the collateral to state B would be "the last event on which is based the assertion that the security interest is ... unperfected." On the other hand, if the collateral had been removed to non-UCC jurisdiction C without any provision such as 9–103(1)(d), there would be nothing to undo the perfection and "the last event" would be the original perfection, even though the collateral may have been in C (without notice to persons there of the security interest) for all but one day. Alternatively, where the collateral was arguably in several jurisdictions, as here, conflicting laws might give rise to several "last events" under the respective laws.

The importance of the physical location of property is also demonstrated by the comment:

---

4. The provisions of 9–103 are intimately related to the substantive provisions of Article 9 (cf. 9–312(1).) However, the purpose of 9–103 is to decide which state's law will determine perfection, priority, etc. rather than to set forth *how* to perfect. As such, it is conflicts law, not substantive law, of any jurisdiction adopting it.

In any event, the tendency of the courts is to treat the law of the situs of property at the commencement of the case as governing to the extent that § 544(a) refers to nonbankruptcy law.

4 Collier on Bankruptcy ¶ 544.02, 544–11 to 544–12 (15 ed. 1981).

■ None of these rules seems effective to carry out the intent of the perfection provisions of secured transactions law on the facts of this case, however. At the time of perfection, the various items of collateral were either in Florida or in another jurisdiction where they were acquired by the debtor. In either case, they were immediately transported to ships of some other registry, and operated by corporations of yet another jurisdiction. On the high seas the collateral would be deemed to be constructively within the territory and therefore within the jurisdiction of a given ship's registry. It would probably continue to be subject to that jurisdiction although a ship would be in port in several additional jurisdictions. See *United States v. Rodgers*, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071 (1893). Finally, at the commencement of the case the collateral was located in Puerto Rico, placed there only for the purpose of liquidation. Throughout it all the secured creditor and the debtor operated their businesses in Florida, and their contracts were executed and performed in Florida.

■ On these facts, and because there is no binding authority on this court against the exercise of its independent judgment as to choice of law, this court concludes that the internal (substantive) law of Florida as to the method of perfection of security interests will be applied. The only other possibly appropriate internal law would be the law of the nation to which each vessel was registered. The physical location of the property is not of major significance here, however, because of the unique nature of its location on a (comparatively speaking) small and moving ship, and the fact that the physical location is not connected with the physical location of the jurisdiction. Normal commercial relations would not relate to the physical location of the goods. The primary "local" persons who would be interested in the property would be retail customers, and their rights are protected under Florida law. In this instance, the most logical place to search for prior liens would be Florida, not the location of the property. Similarly, it would not be logical, and it would be difficult to ascertain and search the jurisdictions where the goods were located when acquired, if other than Florida (as would be required by application of UCC 9–103(1)(b).)

In concluding that the substantive law of Florida should be applied, the court discounts the bank's argument of convenience to the secured party. It would not be unduly burdensome for the secured party to additionally perfect its security interest in the jurisdiction of a ship's registry, and convenience to secured parties is not the overriding factor in a policy determination. The same is true of the bank's argument that it can not have been required to perfect in Puerto Rico because it did not know the collateral was there. Difficult as it often is, a secured party by taking collateral assumes the burden of keeping track of it.

■ Applying the internal law of Florida, the secured party filed its financing statements as required under § 679.302 and § 679.401, Fla.Stats.[5] to perfect its security interest in the goods. It has priority over the trustee, § 679.312(5), Fla.Stats. Therefore, the automatic stay will be modified to permit the bank to foreclose on its collateral.

Pursuant to Bankruptcy Rule 921(a), a Final Judgment incorporating these Findings and Conclusions is being entered this date.

---

5. Although Article 9 has been amended since the filing of the financing statement, the amendments do not affect the validity of the perfection of the bank's collateral acquired either before or after the amendments.