UNITED STATES of America,
Appellant,

v.

Fred M. KELLERMAN, Appellee.

No. 83–5036.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 31, 1983.

Decided Feb. 17, 1984.

Rehearing and Rehearing En Banc
Denied May 31, 1984.

Jean B. Weld, Asst. U.S. Atty., Roanoke, Va. (John P. Alderman, U.S. Atty., Roanoke, Va., on brief), for appellant.

Charles R. Beller, III, Christiansburg, Va., Donald R. Mullins, Tazewell, Va. (James R. Henderson, IV, Mullins & Mullins, P.C., Tazewell, Va., on brief), for appellee.

Before HALL, MURNAGHAN and CHAPMAN, Circuit Judges.

K.K. HALL, Circuit Judge:

The United States appeals from an order of the district court, 555 F.Supp. 843, vacating its prior ruling finding Fred M. Kellerman (Kellerman) guilty of misapplication of bank funds under 18 U.S.C. § 656. We affirm.

I.

Kellerman became president of the Southwest Virginia National Bank (the "Bank") in 1975, after approximately fifteen years of banking experience in other localities in Virginia. In late 1979, Kellerman began personally authorizing payment by the Bank of numerous overdrafts created on a checking account for Cowan Associated Mining Company, Inc. ("Cowan"). By February, 1980, overdrafts in excess of $90,000 had accumulated on Cowan's account.

On February 20, 1980, Kellerman submitted a request to the Bank's Board of Directors for approval of a $170,000 loan to Cowan, to be secured by an assignment of Cowan's stock and coal reserves. The stated purpose of the loan was to cover the overdrafts and to provide Cowan with new capital. The Board approved the loan.

Early in the morning on the following day, the Chairman of the Bank's Board of Directors requested that Kellerman convene a special board meeting that day to reevaluate the Cowan loan. Whereupon Kellerman contacted the Bank's attorney and requested assistance in getting Walt Childers (Childers), who had previously expressed an interest in the Cowan property, "to put the money up" for the loan.

The Bank's attorney obtained a check for $165,000 from Childers, drawn on an account for N–S Corporation, along with a letter signed by Childers as vice-president of N–S Corporation and addressed to Cowan. The letter stated that the check was "payable to Southwest Virginia National

Bank escrow for [Cowan]." These items were transmitted to Kellerman in time for the special board meeting.

Kellerman presented to the Board the $165,000 check.[1] According to the letter from N–S Corporation to Cowan:

This check [was] to be held by [Southwest Virginia National Bank] pending final negotiations and closing of transaction for prospective coal lease and related equipment which [Cowan] control[s] or will control in the near future.

By copy of this letter, said bank is directed to deliver said check back to [Cowan] upon [Cowan's] assignment to [N–S Corporation] of a valid marketable, leasehold estate of [Cowan's] property near Brewster-Dale [sic], McDowell County, West Virginia, free from any valid objections.

The evidence in this case revealed that Cowan never owned any marketable leasehold property near Brewsterdale, McDowell County, West Virginia.

At the special board meeting, Kellerman told the Board that Childers had agreed to purchase Cowan's assets if a substantial reduction in Cowan's indebtedness to the Bank was not made at the end of ninety days. Kellerman also told the Board that he would place the check in an escrow account; however, he never did so. The Board rescinded the $170,000 loan to Cowan and extended a new loan for ninety days in the amount of $165,000.

About the time that the ninety-day note matured, in the latter part of May or early June, Childers called Kellerman and said he needed the check for his mining operations. Kellerman, without the Board's authorization or knowledge, returned the check to Childers. The check was never negotiated, and its ultimate disposition is unknown. No copy of it was ever located at the Bank or obtained from any of the witnesses. It is undisputed that N–S Corporation did not have sufficient funds to cover the $165,000 check when it was presented to the Board by Kellerman on February 21, 1980, or at

---

1. The district court accepted the testimony of the members of the Board of Directors that

although Kellerman may have had the letter at the meeting, he did not present it to them.

any time before Kellerman returned the check to Childers.

Kellerman was indicted in May, 1982, on thirty-two counts arising out of a series of loans made by him to a small, interrelated group of borrowers engaged in the coal business during 1980 and 1981, when he was president of the Bank. Count Twenty-Eight of the indictment charged that Kellerman:

> wilfully and knowingly did misapply and abstract the sum of $165,000.00 of the monies and funds of the bank, in that FRED M. KELLERMAN disposed of and converted check drawn on an N-S Corporation account for the amount of $165,000.00 which was received by and intended by the Board of Directors of said Bank to be placed in escrow as collateral on a $165,000.00 loan approved February 21, 1980, to Cowan Mining, Inc., a violation of Title 18, United States Code, Sections 656 and 2.

After hearing all of the evidence, the trial judge found Kellerman guilty under Count Twenty-Eight.[2]

Kellerman then moved for a judgment of acquittal or a new trial on the ground, *inter alia,* that the evidence failed to show a misapplication of Bank funds. The district court vacated its prior ruling and acquitted Kellerman of Count Twenty-Eight, the only remaining Count. Although there was sufficient evidence of Kellerman's intent to deceive the Bank's Board of Directors, the district court found that the check was worthless and therefore concluded that Kellerman could not have misapplied Bank funds. The district court found

that the check was worthless in two respects. First, if the Bank had acquired rights in and had attempted to cash the check, it would have been unable to do so because of insufficient funds. Second, if the Bank had brought a collection suit against N-S Corporation, it would not have been entitled to prevail, because it was not a holder in due course and was, therefore, subject to N-S Corporation's defenses. This appeal by the United States followed.

## II.

On appeal, the United States contends that this Court has jurisdiction to decide this case because an appeal from a judgment of acquittal setting aside a prior bench finding of guilt does not offend the double jeopardy clause. The United States concedes that the Bank could not have cashed the check due to insufficient funds but asserts that that alone does not necessarily mean the check was valueless. The government contends that mere possession of the check by the Bank was sufficient and that the Bank was not required to hold the check in due course for it to have value to the Bank. We conclude we have jurisdiction to decide this appeal pursuant to 18 U.S.C. § 3731,[3] but reject the government's other contention as meritless.

18 U.S.C. § 656 provides in pertinent part that:

> Whoever, being an officer, director, agent or employee of, or connected in any capacity with any ... national bank ... willfully misapplies any of the moneys, funds, or credits *of such bank* or any moneys, funds, assets or securities

---

**2.** Of the 32 counts in the indictment, four were dismissed prior to trial and 25 were dismissed following the close of the government's case-in-chief. Kellerman was acquitted of two other counts following trial.

**3.** The Criminal Appeals Act of 1970, 18 U.S.C. § 3731, provides in relevant part that: "In a criminal case ... no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution." Pursuant to this statute, the government may appeal from a judgment of acquittal vacating an earlier finding of guilt by the district court provided success by the United States on appeal will

result in reinstatement of the prior finding of guilt and not a new trial. *See United States v. DiFrancesco,* 449 U.S. 117, 130, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980) (dicta); *United States v. Morrison,* 429 U.S. 1, 3, 97 S.Ct. 24, 25, 50 L.Ed.2d 1 (1976); *United States v. Steed,* 674 F.2d 284, 285-86 (4th Cir.) (en banc), *cert. denied,* 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982). We conclude that success by the United States on the merits would result in reinstatement of the district court's prior finding of guilt and that therefore we have jurisdiction to decide this appeal.

*intrusted to the custody or care of such bank,* ... shall be fined not more than $5,000 or imprisoned not more than five years, or both; ...

(Emphasis added). Kellerman was not indicted for misapplying funds *intrusted* to the custody or care of the Bank. Rather, he was indicted for misapplying funds *of* the Bank in violation of 18 U.S.C. § 656. Nevertheless, the United States frankly acknowledges that its theory of prosecution in this case was that "Kellerman returned a check which was *intrusted to him and to the bank as collateral, or security, on a loan* and that at the time he returned the check he intended to defraud his employer bank." Government's Brief at 11 (emphasis added). We find that the government indicted Kellerman under the wrong portion of the statute.

### III.

■ To prove the offense charged in Count Twenty-Eight of the indictment, the government was required to prove beyond a reasonable doubt that the check constituted Bank funds. No criminal misapplication of funds occurs when the so-called "funds" consist of worthless paper. *Batchelor v. United States,* 156 U.S. 426, 15 S.Ct. 446, 39 L.Ed. 478 (1895). Thus, if the $165,000

check was worthless when it was returned by Kellerman to N–S Corporation, then funds of the Bank were not misapplied.[4]

■ The United States maintains that whether the check was payable to Cowan or to the Bank is immaterial. According to the government, as long as the check remained in the Bank's possession, it had value to the Bank. We disagree.

■ For the Bank to take the check free from all claims and defenses, entitling it to collect from N–S Corporation in the event of default, the Bank must be a holder in due course. Va.Code §§ 8.3–122; .3–304; .3–306 (1965). Obviously only a holder can be a holder in due course. To be a holder, a person must have "possession of ... an instrument ... drawn, issued or indorsed to him or to his order or to bearer or in blank." *Id.* § 8.1–201(20). Thus, for the Bank to be a holder, the check must have been negotiated to the Bank. *Id.* § 8.3–202(1).[5] Accordingly, whether the check was payable to Cowan or to the Bank is critical in proving that the check was negotiated to the Bank, that the Bank was a holder—and therefore a holder in due course—and that the check had value to the Bank.[6]

---

4. The district court found that Kellerman misrepresented to the Board of Directors: "that he had a good check as security, ... whether or not Childers was going to buy out Cowan and under what circumstances; ... [and] the terms of the so-called 'escrow' letter." Clearly, Kellerman "pulled one over" on the Board, but that is not the question before us. We must decide whether the check constituted "funds" of the Bank within the meaning of 18 U.S.C. § 656. We conclude that the Board's erroneous belief that the check had value is insufficient to support a criminal conviction under the statute.

5. Va.Code § 8.3–202 provides in pertinent part that: "Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order, it is negotiated by delivery with any necessary indorsement; if payable to bearer it is negotiated by delivery." There is no claim here that the check was payable to bearer.

6. The dissent argues that the check constituted funds of the Bank because the government established that the Bank was a holder and be-

cause a holder has rights not available to one who is not a holder. We are not persuaded.

Both the government and the dissent concede that the government did not prove the exact language employed on the check regarding the payee's identity. For the government to argue before this Court that the identity of the payee is immaterial belies the contention that it proved the Bank was a holder. By definition, the holder of a check is the person to whom it is drawn, issued or indorsed. Va.Code § 8.1–201(20). In the absence of evidence to the contrary, the government would have this Court infer that the Bank was the payee. We decline the invitation.

Because the government failed to prove the identity of the payee, the dissent must speculate as to the payee's identity based upon the language of the escrow letter which is, at best, ambiguous. This is a criminal case, and the government has the burden to prove beyond a reasonable doubt that the check constituted funds of the Bank. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). The government could have asked one of its witnesses or Kellerman the identity of the payee. It

The only proof adduced at trial as to the identity of the payee was the "escrow letter" which stated that the check was "payable to Southwest Virginia National Bank *escrow for [Cowan]*." (Emphasis added). This language establishes that the Bank possessed the check only as an escrow agent for N–S Corporation. The check was not delivered to the Bank as collateral for the Cowan loan. As the "escrow letter" provides, the check was in consideration of a prospective coal and equipment lease from Cowan to N–S Corporation. Cowan was to assign a leasehold interest to N–S Corporation, and the Bank was to hold the check pending final negotiations and closing of the contemplated transaction. If the check represented any "funds," it was not funds of the Bank as charged in Count Twenty-Eight of the indictment, but funds of N–S Corporation intrusted to the Bank, and, as we have already explained, Kellerman was not indicted for misapplication of funds intrusted to the Bank.

■ Because the Bank was not a holder in due course, the check was worthless paper, given N–S Corporation's defenses to the check. Va.Code § 8.3–302 defines "holder in due course" to mean "a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice ... of any defense against or claim to it on the part of any person." As against any person not having the rights of a holder in due course, lack of consideration is a defense. *Id.* § 8.3–306; .3–408. Because N–S Corporation never received an assignment of a leasehold estate in Cowan's property in return for the check, the Bank, had it attempted to sue N–S Corporation, would have been subject to the defense of lack of consideration.

■ In addition, the facts belie the government's assertion that the Bank possessed the check as security for the loan to Cowan. The check and letter were an offer by N–S Corporation to buy Cowan's assets and were held by the Bank as an escrow agent pending the closing of that transaction. The Bank gave nothing of value for the check. Kellerman's misrepresentations of the circumstances surrounding the check to obtain the Board's approval of the $165,-000 loan, did not constitute "value" from the Bank to N–S Corporation. The Board's treatment of the check as security to be held in escrow pending Cowan's payment of its ninety-day loan did not in itself impose any obligation upon N–S Corporation to secure Cowan's loan. Accordingly, the check never constituted "funds" of the Bank, and its return by Kellerman was not a violation of 18 U.S.C. § 656 as charged in Count Twenty-Eight of the indictment.

## IV.

For the foregoing reasons, the district court's judgment of acquittal is affirmed.

AFFIRMED.

MURNAGHAN, Circuit Judge, concurring in part, dissenting in part:

I join the majority's opinion to the extent of its holding that our consideration of the

did not do so. We find that the government failed to carry its burden.

Moreover, even if the government had proved that the Bank were a holder, the check was still worthless to the Bank. Without elaborating upon the rights of a holder, the dissent merely asserts that the check had value to the Bank because the "status of holder confers upon a party rights and benefits not available to one who is not a holder." As an example of such rights, the dissent cites Va.Code § 8.3–307 and acknowledges that that statute confers only procedural rights upon the parties. Procedural rights do not render a worthless piece of paper valuable.

The only right of a holder which could conceivably give value to the check in the Bank's possession is the right to payment. *See* Va.Code §§ 8.3–301; .3–306. In this case, if the Bank had attempted to cash the check, payment would have been properly refused for insufficient funds.

Even if N–S Corporation had had sufficient funds to pay the check, the Bank would have had no right to cash it. Assuming that the check was made out in any one of the four ways proposed by the dissent, the undisputed fact remains that the Bank was an escrow agent and as such had no right to cash the check. Thus, the check did not constitute good and valid funds of the Bank.

government's appeal does not offend the double jeopardy clause.

As to the merits of the appeal, however, I dissent. It is worth recalling that the trial court found that Kellerman intended to defraud the Bank,[1] and also that Kellerman insisted and the Board of Directors believed that the check was good, and represented valid funds of the bank.

The majority nonetheless concludes that "[b]ecause the Bank was not a holder in due course, the check was worthless paper" to the Bank. At 285. It therefore reasons that the check was not monies or funds of the Bank, and holds that Kellerman could not be convicted of violating the portion of 18 U.S.C. § 656 under which he was indicted.

There is, I submit, an unjustified leap to the conclusion that the government's failure to prove that the Bank was a holder in due course rendered the paper *worthless* to the bank. I believe instead that the government established that the Bank was a holder, which is sufficient for the government's purposes here, and that it belies the fundamental doctrines of the law of negotiable instruments to conclude that a check, whether or not it is held in due course, is by definition worthless paper to a holder of that check.

As the Uniform Commercial Code, as adopted by Virginia, makes clear, one may be a holder without being a holder in due course. Va.Code § 8.1–201(20) defines a "holder" as one "who is in possession of a document of title or an instrument or an investment security drawn, issued or endorsed to him or his order or to bearer in blank." Va.Code § 8.3–302(1) then defines certain holders as holders in due course.[2] The fatal error of the majority is to assume that an instrument can only be held in due course. The sections of the Code discussed above, however, state unequivocally that an instrument can be held notwithstanding the existence of potential defenses, which may or may not prevail.

For the purposes of Kellerman's case, the only impediment to a conclusion that the Bank was a holder concerned the proof at trial as to whether the Bank was a payee of the check. Since the check had mysteriously disappeared by the time of trial, the government's proof at trial as to the payee depended on the language of the "escrow letter," which stated that the check was "payable to Southwest Virginia National Bank escrow for [Cowan]."[3]

---

1. In its memorandum on the grant of defendant's motion for acquittal, the trial court stated:

The court adheres to its original opinion that the entire events surrounding the matter of the check and the granting of the loan to Cowan Mining Company showed an intention upon the part of the defendant to deceive the members of the Board of Directors. The court is of the opinion that the defendant Kellerman misrepresented to the Board of Directors the situation regarding the lease of Cowan Mining Company and that it was assigned to the Bank as security for the loan; the defendant misrepresented to the Bank that he had a good check as security; the defendant misrepresented to the bank the situation insofar as whether or not Childers was going to buy out Cowan and under what circumstances; there was a misrepresentation about the terms of the socalled [sic] "escrow" letter; there was a misrepresentation or a failure to tell the members of the Board of Directors about returning the check and in concealing that the check had been returned and there was misrepresentation to the Board about the production which was going on at the Cowan

Mining Company and there were misleading status reports given to the Board from time to time over a period of approximately a year. Therefore, the court is of the opinion that the evidence is sufficient in this case overall to show an intent to defraud on the part of the defendant.

Mem.Op., n. 1.

2. § 8.3–302. Holder in due course.—(1) A holder in due course is a holder who takes the instrument
   (a) for value; and
   (b) in good faith; and
   (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

3. At trial, no witness refuted the contents of the escrow letter when the letter was introduced as an exhibit. Walter Childers acknowledged that he had written the letter and that he delivered the check and the letter to Jim Dudley, an attorney for the Bank. Kellerman himself acknowledged that he had received the check; he stated "we had a $165,000 check" which "I was to hold."

Appellees seek to demonstrate that the language in the "escrow letter" is so ambiguous, that the letter does not constitute proof that the Bank was the payee of the check. To illustrate its point, Appellees list six possible ways the check could have been made out based on the escrow letter:

(1) to "Southwest Virginia National Bank Escrow for Cowan Mining";

(2) to "Southwest Virginia National Bank, Escrow Agent for Cowan Mining";

(3) to "Southest Virginia National Bank" with the notation, "for Cowan Mining Escrow Account";

(4) to "Southwest Virginia National Bank and Cowan Mining";

(5) to "Cowan Mining Escrow Account";

(6) to "Cowan Mining" with the notation, "for deposit in Southwest Virginia National Bank Escrow Account."

Based on the language of the escrow letter, it is patently indefensible to argue that the Fifth and Sixth choices are possibilities. No reasonable person would infer that a check made out solely to "Cowan Mining Escrow Account" or "Cowan Mining" would be referred to as a check payable to Southwest Virginia National Bank.[4]

We are therefore left with the first four choices. While a case for selecting any of those four is not implausible, it is not fatal to the government's case that the ambiguity remains unclarified. The choices share the common feature that *in each instance the Bank is a holder.*[5]

The government, therefore, did not prove the exact language employed on the check. It did, however, prove that the Bank was a holder.[6] The only remaining inquiry is whether despite Bank's status as a holder, the check was somehow worthless to the Bank.

At the outset of the inquiry is the rather obvious general proposition that the very status of a holder confers upon a party rights and benefits not available to one who is not a holder.[7] For example, Va. Code § 8.3–307 [8] confers procedural rights in establishing the burdens on the parties in an action to enforce the obligation.

**4.** I do not question Appellee's claim that in addition to the six proffered choices, more possibilities "could be imagined." Assuming, however, that Appellee has provided us with his best offerings, it seems clear that "imaginable" diverges from "plausible" in this context.

**5.** As noted above, a holder is one "who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer in blank." Va.Code § 8.1–201(20). Each of the four choices fits the definition of a holder, since in each case the Bank is in possession of an instrument issued to it.

**6.** Our standard of review is that the judge's initial ruling finding Kellerman guilty, which acts like a jury verdict in a bench trial, "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Steed,* 674 F.2d 284, 286 (4th Cir.1982) *(en banc), cert. denied,* 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982), *quoting Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

**7.** A negotiable instrument is the property of the holder. It is a mercantile specialty which embodies rights against other parties, and a thing of value.

Va.Code § 8.3–419, Official Comments, Note 2. *Cf.* Va.Code § 8.3–102(1)(e), which defines an "instrument" as a "negotiable instrument," and Va.Code § 8.1–201(20), which defines a holder as "a person who is in possession of ... an instrument...."

**8.** § 8.3–307. Burden of establishing signatures, defenses and due course.—(1) Unless specifically denied in the pleadings each signature on an instrument is admitted. When the effectiveness of a signature is put in issue

(a) the burden of establishing it is on the party claiming under the signature; but

(b) the signature is presumed to be genuine or authorized except where the action is to enforce the obligation of a purported signer who has died or become incompetent before proof is required.

(2) When signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense.

(3) After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course. (Code 1950, § 6–411; 1964, c. 219).

Since, in general, an instrument is not inherently worthless to its holder, there only remains the specific question of whether this particular instrument was worthless to its holder. The only argument offered by the trial court on this point is that the N–S Corporation lacked sufficient funds to cover the check. In the same opinion, however, the court provided the appropriate rejoinder:

> The mere fact that there were not funds to cover the check does not necessarily mean that the check was valueless. Had the bank attempted to cash the check and discovered that it was drawn on insufficient funds, perhaps it could have obtained a judgment on the underlying obligation, and perhaps the judgment could have been collected.

Mem.Op. p. 6.

It is of utmost importance to distinguish between a mere insufficiency of funds and insolvency.[9] The trial court relied heavily on a proposition from the seminal case of *Batchelor v. United States*, 156 U.S. 426, 15 S.Ct. 446, 39 L.Ed. 478 (1895) that the misapplication of worthless notes cannot constitute a misapplication of bank funds. Yet *Batchelor* concerned a bank president's scheme of cancelling the indebtedness of an insolvent debtor of the bank.

Here, there was no allegation that the N–S Corporation was insolvent, but merely that there were insufficient funds to cover the check. Furthermore, the evidence indicated that both the Board of Directors and Kellerman believed that there were sufficient funds to cover the check.

The district court was in error, therefore, when it concluded that the check was worthless to the Bank at the time Kellerman returned the check to Childers without the Board's authorization or knowledge. The check provided the Bank with all the rights and privileges conferred upon a holder. The Bank was free to demand fulfillment of the underlying obligation, or, in the stead of a refusal by N–S Corporation to perform, the Bank was free to initiate proceedings for a favorable judgment based on the check.[10]

This view of the evidence leads to the conclusion that Kellerman's conviction should not have been disturbed. The district court found that Kellerman intended to defraud the Bank. Both the Board of Directors and Kellerman insisted that the check was good and valid funds of the Bank. The foregoing arguments have demonstrated that the check was not worthless to the bank.[11]

**9.** *A fortiori,* we must distinguish a case in which the debtor has filed for bankruptcy. In such a case, the filing of a bankruptcy petition "effectively stops any further action in proceedings involving the debtor pending in other courts." *In re Critical Fork Coal Corporation*, 18 B.R. 425 (Bkrtcy.W.D.Va.1982). *Cf. Mueller v. Nugent*, 184 U.S. 1, 15, 22 S.Ct. 269, 275, 46 L.Ed. 405 (1902). Absent such a filing, therefore, the creditor may seek to obtain a judgment. Furthermore, even in the case of bankruptcy of the payor, a check would in many cases still have value since its holder would ultimately share in a *pro rata* distribution to general creditors.

**10.** For these reasons, it is irrelevant that the N–S Corporation possessed potential defenses to the action. The question here is an open one as to whether the status of the Bank rose to the level of holder in due course. That depends on what would be the outcome in civil litigation between payee (the Bank) and payor (N–S Corporation).

Nonetheless, a proven status of valueless has not been established. First, the existence of a holder's rights, not all of which operate solely with respect to the maker of the instrument, are enough to refute a claim of worthlessness. Second, those potential defenses are just that: potential defenses. As against the N–S Corporation, the Bank possessed at least a colorable claim, and a *prima facie* case, which at the very least had settlement value. Even a partial defense would not strip the check of value as to the residue.

While uncertainty continues, the check has value. Virtually every lawsuit, before it has concluded, has some value in the plaintiff's hands up until a final and complete judgment in the defendant's favor has been rendered. At the time Kellerman returned the check, there remained the possibility that the N–S Corporation might fail to assert its defenses at a later date, or that the trier of fact might remain unpersuaded by those defenses. The Bank would thus be entitled to a judgment as well.

**11.** Any claim that the loss to the Bank was merely temporary, of course, affords no assistance to the defendant.

Accordingly, I would reverse the judgment of acquittal and reinstate Kellerman's conviction.

[U]ltimate financial loss to the bank is not required for, nor will subsequent restitution exonerate from, a finding of statutory misapplication. The gist of this critical element of the offense is the withdrawal of funds, however temporarily, from the possession, control, or use of the bank.
*United States v. Duncan,* 598 F.2d 839, 860 (4th Cir.1979), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).