William OTTE, Richard Green and Russell Knapp, as Trustees of Paper Corporation of America, Bankrupt, Plaintiffs,

v.

Murray LANDY, individually and as Mortgage Trustee; I. Lawrence Lesavoy and David Getz, Defendants.

No. 1346.

United States District Court
E. D. Michigan, N. D.

Sept. 12, 1956.

894

David Haar, New York City, Smith &
Brooker, Bay City, Mich., for plaintiffs.

Bevan, Young & Walter, Detroit,
Mich., for defendants.

PICARD, District Judge.

Plaintiffs, trustees in bankruptcy of
Paper Corporation of America, a Dela-
ware corporation, seek to set aside a
mortgage held by defendants of bank-
rupt's assets (all in Michigan) on the
ground that it is in fraud of creditors.

## Findings of Fact.

Suit was started in 1953 to reorganize the Delaware corporation under Chapter X and the case has been in this court since December 8, 1953. Delay has been occasioned due to several reasons, among them an attempt to carry out the original objective of reorganization, kindred suits between parties, demands for admissions, changes in counsel and the taking of depositions. Reorganization failing, the Delaware corporation was declared bankrupt in February, 1955 and hearings in the present case were held in Bay City last May.

Defendant Lesavoy has never filed an answer but his deposition was taken. He was not called as a witness at the hearing although present for some time and up to its last day.

The fraud claimed by plaintiffs, if any, emanates from facts surrounding organization of the Delaware corporation in 1947 at which time Delaware took over payment of a government income tax obligation amounting to a little over $500,-000 and other indebtedness of to wit $213,000 all owed by a Pennsylvania corporation of the same name operating in Michigan. In addition, vendee Delaware assumed the obligation to pay these grantor defendants the balance due on the purchase of the Pennsylvania assets $3,-150,000, for which Delaware gave defendants, who owned the Pennsylvania corporation and sold it to Delaware, its note in the amount of $3,150,000 secured by a mortgage on all its assets. This was really a purchase money mortgage, the amount of the sale price being $3,-350,000 of which $200,000 had been paid.

Incidentally, the government has not become a party to this suit to recover the remainder of the plus $500,000 still due, a sum of approximately $160,000 and defendant Landy freely admits that the claim of the government on the assets involved is superior to his mortgage. In fact an arrangement was entered into between the Delaware corporation and the government by which the government would be paid.

All indebtedness of the original Pennsylvania Paper Corporation of America other than to wit $160,000 still due the government as that indebtedness existed when the Delaware Paper Corporation of America took over in 1947, has been paid. The present indebtedness of the Delaware corporation came into existence in the years 1951 and 1952—four years after the events with which this court is concerned took place, and under the management of the Delaware corporation. Regardless of this fact plaintiffs' counsel has made a valiant attempt to subject all assets of the Pennsylvania corporation as they came to the Delaware corporation, to the payment of debts strictly those of the Delaware corporation incurred four years after the deal was closed, and to extinquish all rights of Landy who was one of the majority owners of all those assets back in 1947 and who accepted the mortgage as security for the sales price.

Here are more facts essential to a better understanding of the 1947 transaction.

Murray Landy and I. Lawrence Lesavoy back in 1944 organized the Paper Corporation of America, a Pennsylvania corporation and got an option on a paper mill in Cheboygan, Michigan. They put in $150,000. Later they bought the mill and in 1945 made $14,888.81 clear; in 1946 their profit was $321,923.60 and in the year 1947 this corporation made the almost unbelievable sum of $1,062,657.-55 net profit. It happened, however, that near the end of the fiscal year 1947 Lesavoy and Landy were not getting along together and were individually in such a high income tax bracket that any dividends received by them from their different corporations would call for a staggering income tax. So they decided to sell and get out of the paper business, which would help them tax-wise since sale of their stock would require a 26 per cent tax to the government instead of the high bracket tax in which they would find themselves as the result of a dividend. Obviously, a business that had made over $1,000,000 that year should not be hard to sell.

After several suggestions and offers submitted, the Juvenile Service League, Inc., of New York, a New York corporation, became interested. This particular corporation had a great advantage over other vendees. It was an eleemosynary institution and any monies which it made used for charity would not be subject to tax. This fit in with the legal advice initially given Landy and Lesavoy, who, of course, realized that a corporation that didn't have to pay any income tax would be in a much better position to pay off sale price installments when due than one that must pay such a tax.

Therefore it was agreed and finally carried out that the 1,500 shares owned by Lesavoy, Getz [1] and Landy, being all shares of the Paper Corporation of America (Pennsylvania corporation) should be turned over to Juvenile, and Juvenile would incorporate a Delaware corporation of the same name as the original Cheboygan Company to wit Paper Corporation of America. In carrying out the deal, assets of the Pennsylvania Paper Company were turned over to the Delaware Company and Delaware issued 100 shares of stock which it turned over to Juvenile in exchange for the 1,500 shares of the Pennsylvania Paper Company which had been sold to Juvenile by the Pennsylvania corporation owners.[2] Finally and as security to Lesavoy and Landy, Delaware gave them a mortgage covering all assets of the Delaware corporation in the amount of $3,150,000. The original sales price was $3,350,000 but the vendors had been paid $200,000 on account when the deal was consummated and at the end of December were given another $500,000.

There is no denying that the intention of Lesavoy and Landy was primarily to arrange their business affairs so they would have to pay 26 per cent tax on their capital gains rather than a much larger amount on dividends and this court finds that they had a right to do this providing they did it legally. Incidentally, the legality has been accepted by the United States government which was informed about the entire deal and what Landy and Lesavoy did has never been questioned by the government.

Now comes the main reason charged by plaintiffs why the mortgage given by the Delaware corporation to Lesavoy and Landy was fraudulent. According to the books of the Pennsylvania corporation its fixed assets were valued at $265,732.04, its other assets at $2,083,-992.47, a total of $2,349,724.51. However, in March of 1947 the Pennsylvania corporation had an appraisal made of its fixed assets by a reputable, efficient firm and the value of those assets according to the appraisal was placed at $1,-944,723.62 which was increased in December 1947 by the Delaware corporation to $2,027,780.33 in considering further machinery purchased in the last nine months (March through December 1947) for the total valuation of $3,961,772.80. The indebtedness of the Pennsylvania corporation as against these assets was $713,985.58. Lesavoy and Landy were thereby selling to the Juvenile Corporation through its dummy, the Delaware corporation, assets of approximately $3,-961,772.80 with indebtedness of $713,-985.58 plus the purchase price of $3,-150,000.

Plaintiffs contend that the assets should be taken as shown by the books— not the new inventory or appraisal, and in seeking to maintain their position plaintiffs' counsel has taken us down

1. Getz only owned a few shares and does not affect the issues herein.

2. Technically, Landy, Lesavoy and Getz turned over their stock certificates to Juvenile and when Juvenile turned that stock over to Delaware, Delaware gave Juvenile 100 shares of its own stock (all) to indicate that Juvenile really owned Delaware. Counsel for plaintiffs in his

brief takes the rather unreasonable position that at this point all Lesavoy, Landy and Getz really had coming was a note from Juvenile or some evidence of indebtedness of Juvenile to them. He treats this as a separate transaction when as a matter of fact the entire plan, including giving of the mortgage was agreed upon right from the beginning.

many off-shoot roads from the original issues. For example he has laid stress on matters such as the reports made by defendants to the state of Pennsylvania in 1948–1949, which is strictly between the Delaware corporation and the state of Pennsylvania; the fact that certain dividends were paid Juvenile which should not have been paid; that Juvenile's directors were getting this corporation's assets without even looking at the property; and other matters that, in our opinion, have nothing to do with the question involved, bearing in mind that

(a) this was a sale by the owners of Paper Corporation of America of their stock covering all the corporation's assets for $3,350,000; and

(b) those were of an inventoried fair value of $3,961,772.80 with debts of $713,985.58; not including as worthy of consideration status the rather valuable asset of the company's good will after a year in which it had made over $1,000,-000 profit.

■ Then as to the fixed assets which plaintiffs state were greatly over-valued, no proof was introduced to sustain this contention, while defendants offered testimony which tended to prove that the fixed assets were actually worth the higher of the two valuations placed on them. Still the burden of proof was on plaintiffs, not defendants. Rossman v. Hutchinson, 289 Mich. 577, 286 N.W. 835.

### Conclusions of Law.

Let us dispose of preliminary legal issues.

■ The mortgage in question was given on real property and chattels located in the state of Michigan. Therefore, its effect and validity, i. e., whether or not it is in fraud of creditors depends upon the law of that state. Restatement, Conflict of Laws, Sections 225, 265; Palmer v. Mason, 42 Mich. 146, 3 N.W. 945; Clark v. Chapman, 215 Mich. 518, 527, 184 N.W. 497. Other authorities are in accord. See Castellano v. Osborne, 2 Cir., 16 F.2d 187; Royal Baking Powder Co. v. Hessey, 4 Cir., 76 F.2d 645. But, in any event, this is not of the greatest importance since interpretations of both New York and Michigan Fraudulent Conveyances Acts are, so far as this case is concerned, the same.

Plaintiffs' counsel also lays stress upon the Landy-Lesavoy relationship. He states that,

(a) since Lesavoy purchased Landy's interest Landy is out of the picture entirely and,

(b) under no circumstances could Landy be a trustee for himself.

We dispose of this by stating that the only trustee mentioned in the mortgage for all three, Landy, Lesavoy and Getz, was Landy who sold out his interest in the mortgage to Lesavoy but took back the mortgage itself as security. He is the only one who could rightly sue here and nothing Lesavoy could have done in this litigation would interfere with Landy's rights.

■ Furthermore, the case cited by plaintiffs, Wetmore v. Parker, 52 N.Y. 450, is neither in point nor the great weight of authority. One of several beneficiaries of a trust may be the sole trustee. Edgerton v. Johnson, 7 Cir., 178 F.2d 106 and 90 C.J.S., Trusts, § 210c, p. 137.

But plaintiffs rely chiefly upon Sections 4, 5 and 6 M.S.A. §§ 26.884–26.886, Comp.Laws 1948 Mich. §§ 566.14–566.16, of Michigan Fraudulent Conveyances Act to support their contention—

"26.884. Conveyance by insolvent. Sec. 4. Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

"26.885. Conveyances by persons in business. Sec. 5. Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands

after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

"26.886. Conveyances by a person about to incur debts. Sec. 6. Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

■■■ In construing the above statutes to determine the question of fraud, we consider conditions only as they existed at the time of the transfer. Subsequent developments, uninfluenced by conditions as they existed at the time of the transfer, are of no consequence. Wright v. Brown, 317 Mich. 561, 27 N.W. 2d 97. Also fraud will not be inferred, but must be proven, Rossman v. Hutchinson, supra, the burden of proof resting upon the party making the assertion. Wright v. Brown, supra.

■■■ Sections 4, 5 and 6 of Michigan's Fraudulent Conveyances Act, supra, deal with conveyances by insolvents, conveyances by persons in business and conveyances by a person about to incur debts respectively. Incidentally, plaintiffs claim constructive not actual fraud. See M.S.A. § 26.887, Comp.Laws 1948 Mich. § 566.17. Plaintiffs do not claim that any of these parties purposely tried to commit a fraud, but rather that the results of what defendants did amounted to fraud. So the magic words here are "without a fair consideration" and under the above before such transfers are deemed to be in fraud of creditors, it must be shown in each instance that the conveyance was made *without a fair consideration*. (Emphasis ours.) This is true even though the grantee is insolvent or is rendered insolvent thereby, or is left with an unreasonably small capital. In

other words, if a fair consideration is given in exchange, an aggrieved creditor loses his right to have the transaction declared fraudulent. And "fair consideration" itself is defined in Section 26.883 of Michigan's Fraudulent Conveyances Act, M.S.A., Comp.Laws 1948 Mich. § 566.13—

"Fair consideration. Sec. 3. Fair consideration is given for property, or obligation;

"(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

"(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained."

■ Did the Delaware corporation receive a fair consideration in the transaction involved? As stated in our Findings of Fact, it received, in exchange for an assumption of liabilities of $3,913,985.88 (this includes mortgage debt)

(a) assets valued at $3,878,716.09 or $3,961,772.60, depending upon the valuation given the fixed assets; and

(b) a business that, in addition to being a going concern, had earned $1,062,-000 net profit in its present year of operation.

Sub-section (b) above, while seemingly not added as an asset in fixing the sale price when considered as it should have been with its (Pennsylvania corporation) intangibles such as good will, established customer relationships, etc. was worth, in the opinion of this court, an additional $2,000,000 or $3,000,000 as a minimum.

Furthermore, to Delaware's liabilities plaintiffs seem to want to consider the whole payment price as immediately due. It was not. Payment of the $3,150,000 was staggered over a period of years the probable payment of which on the due dates was augmented by the fact that the

real owner was a charitable institution and exempt from heavy taxation.

Under the mortgage above, the payment of the $700,000 that was made before December 30, 1947 the Delaware corporation had to pay $250,000 by July 15, 1948. From then on payments were to be made at $100,000 a year. In Section 26.882 M.S.A., Comp.Laws 1948 Mich. § 566.12, the Fraudulent Conveyances Act defines insolvency when

"Sec. 2. (1) A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."

We cannot agree with plaintiffs that even taking their own figures the assumption of the mortgage rendered the Delaware corporation insolvent because the payments made on the debt secured by the mortgage did not become "absolute and matured." The history of this corporation was evidence itself that the installments would be paid and certainly a corporation that had just made $1,000,000 in one year would have had a "present fair salable value" more than required to pay that corporation's "probable liability" on "existing debts as they became absolute and matured."

While we hold that the Delaware corporation received a fair consideration in exchange for its mortgage to defendants, it would seem that, even though the contrary were true, under the circumstances of this case the mortgage would nevertheless be valid. In Lackawanna Pants Mfg. Co. v. Wiseman, 6 Cir., 133 F.2d 482, as in the case at bar, a corporation without any assets was organized for the specific purpose of taking assets of another person with the understanding that it would give a mortgage on those assets to secure the purchase price. Bankruptcy ensued and in holding the mortgage valid over objections of creditors Judge Simons, speaking for the court, said at page 485:

"Assuming, for the moment, that the mortgage to Koppelman was given without fair consideration, its execution did not leave the mortgagor with an unreasonably small capital. The mortgagor had no capital to begin with, and so parted with nothing. The mortgage was a purchase money mortgage, and if it had any effect upon the capital of the bankrupt it was to create for it an equity, highly speculative, no doubt, but nevertheless an equity measured by the value that might remain in the merchandise after payment of the mortgage. The instrument did not come within the condemnation of § 13396. Section 13397 (§ 6) provides that every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors. Again assuming that the mortgage was without fair consideration, the record is silent as to any intention or belief of the mortgagor, its officers or directors, that they would incur debts beyond the ability of the corporation to pay as they mature. Nor are there facts or circumstances from which such intention or belief may reasonably be inferred. The statute concerns itself with the intention or belief of the person making the conveyance or entering into the obligation, and is not at all concerned with the intention or belief of the grantee or mortgagee."

Plaintiffs assert two other grounds for holding the mortgage invalid. The first is defendants' failure to renew the mortgage on the chattels, within one year as required by M.S.A. § 26.932, Comp. Laws 1948 Mich. § 566.143. While Judge Tuttle's language—In re Dagwell, D.C., 263 F. 406, to wit, that unless the creditors have obtained liens on the property covered by the mortgage prior to the filing of the required affidavit of renewal the mortgage would become good upon renewal, would serve defendant Landy

**900**

to good purpose, nevertheless Landy, through his counsel, has agreed that those chattels not part of the realty be exempted and not covered by the final judgment. And in this connection in order to avoid further embarassment or litigation we have decided that the amount of those chattels is as limited by defendants in their brief at page 44 in the sum of $52,185.06.

Plaintiffs' second contention is that when the Delaware corporation assumed the liabilities of its predecessor, the latter was indebted to the United States in the amount of $530,744.87 for taxes. At present, approximately $160,000 of this amount remains unpaid. Although defendants admit that this debt has priority over their mortgage, plaintiffs reason that since the United States was an existing creditor, Section 70, sub. e(1) of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. e(1), authorizes them, as trustees to set aside the mortgage for the benefit of subsequent creditors as well.

Section 70, sub. e(1) of the Bankruptcy Act reads:

"A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this Act which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this Act, shall be null and void as against the trustee of such debtor."

An examination of the above section reveals that, unless this transaction is deemed fraudulent or invalid under the law of Michigan, this section has no application and consequently subsequent creditors are not entitled to the same priority to which defendants admit the United States is entitled.

We inject still another thought. Plaintiffs stress the point that a tax due the United States is a debt. With that we have no quarrel. But is it the kind of a debt that is anticipated by the Fraudulent Conveyances Acts of either Michigan or New York? No mortgage given by either the Delaware or the Pennsylvania corporation could reduce priority of the United States in collecting its tax. If the lien had been recorded in the Register of Deed's office in Cheboygan before the mortgage was given (no evidence) the United States had priority. See United States v. Security Trust & Savings Bank, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53; Bruce v. United States, D.C., 127 F.Supp. 858 and if it had not been so recorded the United States had priority anyway (See 191 Title 31 U.S.C.A.). There is, therefore, a grave doubt that this "debt" is affected at all by the mortgage or within the provisions of the Fraudulent Conveyances Act. If not, and such a debt from the old Pennsylvania corporation must have been in existence in 1953 when bankruptcy reorganization was started before plaintiffs would have any rights in this law suit as admitted by plaintiffs (page 32 of plaintiffs' brief), what becomes of plaintiffs' contention? All the other debts that the Fraudulent Conveyances Act aims to protect have been paid and neither the validity nor the priority of the government's lien is affected at all by the mortgage or the Fraudulent Conveyances Act.

This is another hurdle for plaintiffs but we do not deem it necessary to decide that question.

We conclude by saying that counsel for plaintiffs seemingly attribute the Delaware corporation's financial adversity and eventual bankruptcy to the execution of the mortgage in question although the bankruptcy occurred years later. While the court was prepared to limit the evidence no testimony was proposed to show that the financial plight of the Delaware corporation could be attributed to any act of defendant either at the time the original agreement was entered into or later and the fact that Delaware continued its operations for almost six years after the mortgage was executed tends to establish that bankruptcy probably came as the result of poor management, including the remote control by a board of directors which imagined that the golden bonanza would continue without business

supervision, or perhaps the $400,000 that was taken from the assets of Delaware in 1952. See page 17 of Trustee's Report to Creditors (defendant Landy's exhibit K) wherein it is claimed that $432,396.49 was advanced to Lesavoy Industries, Inc., in 1952. See also pages 22, 23 of defendant Landy's main brief where it is stated that Landy had nothing to do with management of Delaware in 1952 and has no knowledge of the diversion of funds or who received them. That loan might have been the straw that broke the camel's back.

Under the authorities cited herein, we find the complete transaction free from the taint of fraud, actual or constructive. Therefore, we are constrained to hold the mortgage valid and enforceable.