In re KAISER STEEL CORPORATION, Debtor.

KAISER STEEL CORPORATION, Plaintiff,

v.

Irwin L. JACOBS, et al., Defendants.

Bankruptcy No. 87 B 1552 E.
Adv. No. 87 E 137.

United States Bankruptcy Court,
D. Colorado.

May 31, 1988.

H. Thomas Coghill, David J. Richman, Coghill & Goodspeed, P.C., Denver, Colo., Gerald K. Smith, Susan M. Freeman, Randolph J. Haines, Lewis and Roca, Phoenix, Ariz., for plaintiff, Kaiser Steel Corp.

Richard H. Shaw, Barry L. Wilkie, William Bruce Thompson, Charles R. Beach, Shaw, Spangler & Roth, Denver, Colo., Robinson B. Lacy, Sullivan & Cromwell, New York City, for defendant, Goldman, Sachs & Co.

## OPINION AND ORDER ON MOTION TO DISMISS CLAIMS FILED BY DEFENDANT GOLDMAN, SACHS & CO.

CHARLES E. MATHESON, Chief Judge.

This matter comes before the court on Defendant Goldman, Sachs & Co.'s ("Goldman Sachs") motion to dismiss the claims asserted against it pursuant to Bankruptcy Rule 7012(b) and Federal Rules of Civil Procedure Rule 12(b)(6).

Kaiser Steel Corporation ("Kaiser" or "Plaintiff") filed an amended complaint herein by which it seeks to recover funds transferred prepetition or, alternatively, to set aside such transfers to the defendants. The amended complaint is brought pursuant to 11 U.S.C. §§ 541, 544, 548 and 550; California Civil Code § 3439.01 *et seq.* (1985); and common law.

### BACKGROUND

Goldman Sachs has moved to dismiss the complaint asserting that it fails to state claims under Section 544(b) since the complaint does not allege that the transfers at issue were made with actual intent to hinder, delay or otherwise defraud creditors, a condition to relief under the Colorado statute against fraudulent conveyances. *See,*

Colorado Rev.Stat. § 38–10–117. Section 544(b) of the Bankruptcy Code states in relevant part:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

Goldman Sachs' motion therefore raises the question whether California, Colorado or, arguably, other state law should govern the Kaiser claims being brought pursuant to Section 544(b) in the First through Third Claims for Relief.

Goldman Sachs also moves to dismiss the amended complaint premised upon its assertion that, even were California law to govern this case, fraudulent conveyance law, generally, should not be applied to complex and sophisticated financial transactions such as the leveraged buyout ("LBO") at issue herein. In support, Goldman Sachs maintains that the constructive fraud provisions of the California Uniform Fraudulent Conveyance Act ("UFCA") provide no basis for setting aside the transfers made pursuant to the LBO since application of the UFCA to avoid such transfers would be inconsistent with the purposes of that statute. Alternatively, Goldman Sachs argues that the transfers should not be set aside since fair consideration was received by Kaiser for the property transferred to its shareholders.

In reviewing the sufficiency of the amended complaint in the context of a motion to dismiss, the Court must accept all of Kaiser's well-pleaded allegations as true and otherwise view those allegations in the light most favorable to the Plaintiff. *Miree v. DeKalb County, Georgia,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). A complaint is properly dismissed pursuant to a motion to dismiss only if it appears that the allegations are insufficient as a matter of law to state a claim that would entitle the pleader to relief, resolving all doubts in the pleader's favor. *Hydro-Tech Corp. v. Sundstrand*

*Corp.*, 673 F.2d 1171, 1173 n. 2 (10th Cir. 1982).

The essential facts, as pleaded in the amended complaint, are as follows:

(1) On or about January 18, 1984, the Kaiser annual meeting of stockholders was held in Oakland, California.

(2) That annual meeting was convened pursuant to a notice mailed by Kaiser from its executive offices in Fontana, California.

(3) Kaiser's principal place of business was Fontana, California, at the time of the January 1984 annual stockholders' meeting.

(4) At the January 1984 annual stockholders' meeting, the Kaiser shareholders approved the reincorporation of Kaiser whereby Kaiser Steel Corporation (Nevada) was merged into its wholly owned subsidiary Kaiser Steel, Inc. (Delaware). Immediately thereafter, the shareholders approved the merger agreement involving Kaiser Steel (Delaware) and the newly formed Kaiser Acquisition Corporation. The above mergers and related implementing transfers shall be referred to collectively as the "1984 LBO."

(5) On January 18, 1984, the Jacobs group of shareholders were paid approximately Fourteen Million Dollars ($14,000,000.00) in cash by Kaiser for an option to purchase the Kaiser stock held by that group ("Jacobs Option").

(6) The effective date of the 1984 LBO approved at the January 1984 annual meeting was February 29, 1984.

(7) On February 29, 1984, all outstanding shares of Kaiser Steel (Nevada) were converted into a right to receive Twenty–Two Dollars ($22.00) in cash plus one share of Series A preferred stock of the resulting Kaiser merged corporation bearing a cumulative annual dividend of $1.04, plus one share of Series B preferred stock of the merged corporation bearing a cumulative annual dividend of $2.25.

(8) In March 1984, the cash distributions implementing the shareholders' approval of the 1984 LBO for the outstanding shares of Kaiser were made through the Bank of America offices in San Francisco, California.

(9) At the time of the above-stated corporate restructuring activity and transfers making up the 1984 LBO, there were an undetermined number of unsecured creditors of Kaiser in California who remained as such creditors on the date Kaiser's petition in bankruptcy was filed.

(10) Goldman Sachs was a shareholder of Kaiser at all times relevant to the transfers at issue in the amended complaint and received cash, dividends and other property as a result of the 1984 LBO.

(11) The cash portion of the Jacobs' Option and the purchase and/or redemption of common stock by Kaiser pursuant to the 1984 LBO was paid for out of a) Kaiser's then current assets and borrowings and b) a loan from Citibank, N.A. which was secured by an encumbrance on Kaiser assets.

(12) The Jacobs Group transferred their common shares to Kaiser for Forty Dollars ($40.00) cash per share and one share each of Series A and B preferred stock.

(13) Kaiser paid from its assets cumulative annual dividends required under the terms of the 1984 LBO and by the terms of the Series A and B preferred stock, such dividends being paid on a quarterly basis from January 1984 through and including February 18, 1986.

(14) Kaiser was rendered insolvent as a result of the transfers of its cash and Series A and B preferred stock pursuant to the 1984 LBO and remained insolvent at all times thereafter.

Many other defendants have adopted or otherwise joined Goldman Sachs in its mo-

tion to dismiss. In ruling on Goldman Sachs' motion, the Court will therefore similarly address and dispose of those motions of other party-defendants which have adopted the arguments of Goldman Sachs as put forth in its motion.

## MEMORANDUM

### I. CHOICE OF LAW

Kaiser sets out four claims for relief in its amended complaint against the numerous defendants (set forth in the Addendum at note 1). Three of these claims are brought pursuant to 11 U.S.C. § 544(b) relying upon "applicable law" which would be available to any unsecured creditor to void or otherwise set aside the transfers or conveyances at issue in the within matter. Kaiser, as the debtor-in-possession, may utilize the avoidance powers of Section 544 pursuant to 11 U.S.C. § 1107.

Regarding the "applicable law" which shall govern the fraudulent conveyance claims being brought by Kaiser under Section 544(b), this Court must first determine what choice of law rules shall apply. Were the Court hearing this matter as a federal district court sitting in diversity, the conflict of law issue would be easily resolved. In that situation, this Court would be bound to apply the conflict of law rules of the forum state. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

However, there is a clear split of authority whether federal courts sitting pursuant to the special grant of bankruptcy jurisdiction are bound to mechanically apply the *Klaxon* choice of law rule. This issue remains unresolved since the Supreme Court, the Fifth Circuit and certain other federal courts which have addressed the question have failed to settle the matter when they have had the opportunity. *See Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 161–63, 67 S.Ct. 237, 239–40, 91 L.Ed. 162 (1946); *Woods–Tucker Leasing Corp. of Georgia v. Hutcheson–Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir.1981); *In re L.M.S. Associates, Inc.*, 18 B.R. 425, 428–30 (Bankr.S.D.Fla. 1982); *Fox v. Peck Iron and Metal Co.,*

*Inc.*, 25 B.R. 674, 684–87 (Bankr.S.D.Cal. 1982).

Other courts, including the Ninth Circuit, have determined that a federal court sitting pursuant to bankruptcy jurisdiction should not be required to follow the choice of law rule of the forum state pursuant to *Klaxon, supra*, but may exercise its "independent judgment" and choose that state's substantive law which it deems appropriate in the case before it, pursuant to the Supreme Court's nondispositive discussion of the issue in *Vanston, supra*. *See In re Holiday Airlines Corp.*, 620 F.2d 731, 733–34 (9th Cir.1980); *Matter of Barney Schogel, Inc.*, 12 B.R. 697, 700 (Bankr.S.D.N.Y. 1981); *In re L.M.S.*, 18 B.R. at 430. The "independent judgment" approach has the support of commentators who conclude that a federal bankruptcy court should use federal conflict of law rules (i.e. its independent judgment) when applying a federal law even though it refers to state law since the court is essentially applying a federal scheme of law, e.g., bringing a voidance action pursuant to Section 544(b) that looks to applicable state law. *See* 4 Collier on Bankruptcy, ¶ 544.02 at 544–13 (15th ed. 1985); 1A Moore's Federal Practice ¶ 0.322(1) (2d ed. 1981); *See also, Note*, 68 Harv.L.Rev. 1212, 1219 (1954).

Were this Court to exercise its independent judgment as to the proper choice of law rules to apply herein, it would take notice of the guidelines articulated by the Supreme Court in *Vanston, supra*, wherein it stated in pertinent part:

[O]bligations ... often have significant contacts in many states so that the question of which particular state's law should measure the obligation seldom lends itself to simple solution. In determining which contact is the most significant in a particular transaction, courts can seldom find a complete solution in the mechanical formulae of the conflicts of law. Determination requires *the exercise of an informed judgment* in the balancing of all the interests of the states with the *most significant contacts* in order to best accommodate the equities among the parties to the policies

of those states. *Vanston,* 67 S.Ct. at 239 (emphasis supplied).

The Supreme Court set out the above choice of law guidelines within the context of bankruptcy jurisdiction but decided the *Vanston* case on other grounds. Hence, the above *Vanston* guidance is *dicta,* though subsequently adopted as the rule of law by the Ninth Circuit and various other federal courts. *See Holiday Airlines, supra; Barney Schogel, supra;* and *In re L.M.S., supra.*

The "most significant contacts" approach recommended by *Vanston* is essentially synonymous with the "most significant relationship" approach adopted by the Colorado Supreme Court as to claims sounding in tort and contracts. *See First National Bank in Fort Collins v. Rostek,* 182 Colo. 437, 514 P.2d 314 (1973) (tort actions); *see also, Wood Bros. Homes, Inc. v. Walker Adjustment Bureau,* 198 Colo. 444, 601 P.2d 1369, 1372 (1979) (*en banc* decision adopting the *Restatement (Second) of Conflict of Laws 2d* ("*Restatement (Second)*") approach for contract actions for the same reasons enunciated in *First National Bank in Fort Collins v. Rostek, supra,* where the Colorado Supreme Court earlier adopted the *Restatement (Second)* approach for tort actions).

The "most significant relationship" approach adopted by the Colorado Supreme Court both in *Rostek* and *Wood Bros.* is founded upon the principles set forth in *Restatement (Second)* § 6 (1971). As Section 6 provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

The claims set forth in the amended complaint sound both in equity and tort. Kaiser pleaded in the alternative under each of its four claims for relief. It has requested that either (a) certain transactions and conveyances resulting from the 1984 LBO be declared void as fraudulent conveyances under the First through Fourth Claims for Relief (claims requesting equitable relief) or (b) damages be awarded in an amount not less than one hundred and forty million dollars ($140,000,000.00), under the First, Second and Third Claims for Relief, as compensation for the value of cash payments, dividends and property transferred pursuant to the 1984 LBO, as well as damages in the aggregate amount of five million four hundred thousand dollars ($5,400,000.00) under the Fourth Claim for Relief as compensation for the value of the dividend payment made on February 18, 1986 (the claims sounding in tort).

Colorado courts have not yet had occasion to specifically apply its "most significant relationship" approach to equitable relief actions. However, the Colorado Supreme Court has made it clear that the principles enunciated in Section 6 of the *Restatement (Second)* shall be taken into account together with the more specific sections of the *Restatement (Second)* that apply to the particular type of action at issue. *See Rostek, supra; Wood Bros., supra; see also Dresser Industries, Inc. v. Sandvick,* 732 F.2d 783, 786–87 (10th Cir. 1984) (all three of these above-cited decisions analyze the choice of law issue in the same manner, taking into account both the Section 6 and more specific sections of the *Restatement (Second)* as pertains to the type of action under scrutiny).

In its brief, Goldman Sachs maintains that the equitable relief sought by Kaiser is remedial or procedural in nature and this Court must therefore apply the law of the forum, or *lex fori.* Such a stance does not

reflect the fact that Colorado courts have consistently adopted the approach of the *Restatement (Second)* which eliminates the "substantive" vs. "procedural" dichotomy and instead focuses directly on the particular issue or type of action in deciding the conflict of laws question before the Court. *See Rostek, supra; Wood Bros., supra; see also Restatement (Second),* § 122, Comment b.

■ In determining which state's substantive law shall govern the fraudulent conveyance claims being brought herein, this Court's analysis is guided by those decisions of the Colorado Supreme Court wherein it established the "most significant relationship" test based upon Section 6 of the *Restatement (Second), e.g. Rostek, supra; Wood Bros., supra; see also, Ede v. Mueller Pump Co.,* 652 F.Supp. 656, 658–59 (D.Colo.1987); *Conlin v. Hutcheon,* 560 F.Supp. 934, 935 (D.Colo.1983); *Dresser Industries, supra.* Given the consistent analytical approach employed by the Colorado Supreme Court in the above-cited cases, this Court is confident that those deliberations provide more than adequate authority to establish that Colorado has adopted the choice of law approach incorporated in the *Restatement (Second).* Pursuant to Section 6 of the *Restatement (Second),* together with its more particular provisions concerning the specific type of action at issue, the choice of law approach followed by Colorado is that of the "most significant relationship" test. *See Rostek, supra; Wood Bros., supra; Restatement (Second),* § 122, Comment b; *see also, City of Aurora v. Bechtel Corp.,* 599 F.2d 382, 386 (10th Cir.1979); *Rawson v. Sears, Roebuck & Co.,* 822 F.2d 908, 910–12 (10th Cir.1987).

With respect to the fraudulent conveyance claims being asserted in the form of equitable relief, Section 244 of the *Restatement (Second)* has direct bearing on the choice of law question before the Court. Section 244 provides, regarding a chattel, in pertinent part:

> *Validity and Effect of Conveyance of Interest in Chattel*
>
> (1) The validity and effect of a conveyance of an interest in chattel as between the parties to the conveyance are determined by the local law of the state which, with respect to the particular issue, has the *most significant relationship to the parties, the chattel and the conveyance* under the principles stated in § 6 [of the *Restatement (Second)* ] (emphasis supplied).

In Comment j to Section 244, it is specifically contemplated that said section is intended to be relied upon in resolving questions of fraudulent conveyances as between the parties to the conveyance and fraud as against third parties, such as conveyances in fraud of creditors, as alleged in this case. Section 244 incorporates the "most significant relationship" approach embodied within Section 6 of the *Restatement (Second),* as adopted by Colorado in *Rostek, supra,* and *Wood Bros., supra.* Under Section 244, the law of the courts of the situs of the property will usually apply to resolve questions of fraud and the validity of the conveyance at issue especially when the location of the property is the same as the site of the conveyance. This is in keeping with the preference of bankruptcy courts to similarly rely on the state law of the situs of the property when such site is also where the transaction or transfer took place. *See Otte v. Landy,* 143 F.Supp. 893 (E.D.Mich.1956), *aff'd* 256 F.2d 112 (6th Cir.1958); 4 Collier on Bankruptcy, ¶ 544.03 at 544–13–14 n. 17 (15th ed. 1986); 4B Collier on Bankruptcy ¶ 70.71 at 787–88 n. 9 (14th ed. 1975).

■ It is quite clear from the face of the amended complaint that all or substantially all of the transfers and other transactions related to the 1984 LBO occurred in or originated from California. The underlying transactions at issue were approved by the shareholders and otherwise were derivative of actions taken in California implementing the corporate restructuring decisions made at the 1984 annual meeting of stockholders in Oakland, California. Moreover, substantial cash distributions made for the acquisition of the outstanding Kaiser shares pursuant to the 1984 LBO were also allegedly made in or directed from California. Further, the principal place of

business of Kaiser was Fontana, California, at the time when the underlying transactions implementing the 1984 LBO took place. Finally, a significant number of the creditors who may have been affected by the transfers were located in California. Significantly, the complaint does not alleged a single contact with Colorado at the time of the LBO.

A comparison of the relative contacts of California, Colorado and other states to the transactions and transfers alleged at issue herein establishes that California quite clearly possesses the "most significant relationship" or "most significant contacts" to those transactions in light of both the Colorado choice of law rules and the independent judgment approach set forth in *Vanston, supra.* Even were this Court required to make an independent judgment regarding federal choice of law rules, it would come to the same conclusion recommended by Colorado choice of law rules— that California substantive law should govern the within fraudulent conveyance claims. *See Woods–Tucker Leasing Corp.,* 642 F.2d at 748–49; *Fox v. Peck Iron,* 25 B.R. at 687. Therefore, pursuant to the findings and conclusions set forth above, California law shall govern both the tort and equitable relief claims asserted by Kaiser herein.

■ Kaiser's amended complaint does not allege under the First or Second Claims for Relief that the transfers or distributions made pursuant to the 1984 LBO were made with actual intent to defraud creditors. It does, however, set forth specific allegations which track the express provisions of the California UFCA. *See* Cal.Civil Code §§ 3439.04, 3439.05, 3439.06 (1985) (set forth in the Addendum at note 2).*

Accordingly, Goldman Sachs' motion to dismiss the First, Second and Third Claims for Relief as set forth in Kaiser's amended complaint, premised upon the view that

Colorado substantive law applies, is not well taken. Kaiser's reliance on theories of constructive and intentional fraud pursuant to the pertinent provisions of the UFCA as enacted in California is therefore proper premised upon its well-pleaded allegations and such claims for relief therefore withstand Goldman Sachs' motion to dismiss.

## II. APPLICABILITY OF FRAUDULENT CONVEYANCE LAW (UFCA) TO LBOS

■ Goldman Sachs next argues that the UFCA and fraudulent conveyance law, generally, should not apply to the sort of complex financial transactions undertaken in connection with a LBO such as the one at issue in this case. In support, it states that the UFCA is derivative of sixteenth century English law (Statute of Fraudulent Conveyances, 13 Eliz., ch. 5 (1571)) and that the UFCA itself was drafted in 1918, long before the advent of the modern LBO. Both of these latter assertions are true.

However, to argue that a law, when drafted, did not contemplate a particular set of circumstances or actions and further maintain that such a law should be deemed inapplicable to such unforeseen circumstances is generally not very persuasive. Such an argument is at odds with much which has transpired in Anglo–American jurisprudence.

The Supreme Court has previously had occasion to rule as to the proper reading to be given a statute in face of the charge that the literal meaning would be at odds with the spirit and purpose of the act. In the case of *Crooks v. Harrelson,* 282 U.S. 55, 51 S.Ct. 49, 75 L.Ed. 156 (1930), the Supreme Court stated:

> Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which liter-

---

* The relevant provisions of the California UFCA are applicable to this case since the allegations of the amended complaint concern transfers and conveyances approved at the January 1984 annual meeting, together with subsequent implementing transactions, all of which took place before 1987. California has subsequently adopted the Uniform Fraudulent Transfer Act ("UFTA") which is the successor to the UFCA. The UFTA, as adopted by California, became effective January 1, 1987, after the transfers and related transactions at issue herein had occurred.

ally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle [overriding the literal terms and plain meaning of a statute in order to avoid an absurdity so gross as to shock the general moral or common sense] so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter [citation omitted]. It is not enough that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the lawmaker himself, turn out to be mischievous, absurd, or otherwise objectionable. But in such case the remedy lies with the lawmaking authority and not with the courts [citations omitted]. 51 S.Ct. at 50–51. *See also, Garcia v. United States*, 469 U.S. 70, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).

In the recent case of *United States v. Nichols*, 841 F.2d 1485 (10th Cir.1988), the Tenth Circuit Court of Appeals similarly ruled upon the reading to be given the plain language of a statute. As the Tenth Circuit stated:

> But the "fact that [a Law] has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *United States v. Nichols*, 841 F.2d at 1493, *citing Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499, 105 S.Ct. 3275, 3287, 87 L.Ed.2d 346 (1985).

Other courts which have addressed the issue of whether LBOs are subject to laws against fraudulent conveyances, including the UFCA, have recognized that LBOs are not insulated from the coverage of those laws. *See United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd Cir.1986); *Kupetz v. Wolf*, 845 F.2d 842 (9th Cir.1988); *Ohio Corrugating Co. v. Security Pacific*

*Business Credit, Inc.*, 70 B.R. 920 (Bankr. N.D.Ohio 1987); *Anderson Industries, Inc. v. Anderson*, 55 B.R. 922 (Bankr.W.D.Mi. 1985). As the Third Circuit Court of Appeals stated in *Tabor Court*, in pertinent part:

> The Act's [UFCA] broad language, however, extends to *any* "conveyance" which is defined as "every payment of money ... and also the creating of any lien or encumbrance." (citation omitted). This broad sweep does not justify exclusion of a particular transaction such as a leveraged buy-out simply because it is innovative or complicated. If the UFCA is not to be applied to leveraged buy-outs, it should be for the legislatures, not the courts, to decide. *Tabor Court*, 803 F.2d at 1296 (emphasis supplied).

It cannot be controverted that the amended complaint unambiguously sets forth facts which satisfy the elements of those provisions of the California UFCA relied upon in the First through Third Claims for Relief as constituting transfers subject to the UFCA as fraudulent conveyances. *C.f.*, Cal.Civ.Code, §§ 3439.04–3439.06 (1985). The same is true regarding the Fourth Claim for Relief brought pursuant to 11 U.S.C. § 548. Taking those well-pleaded allegations as true, and having ruled above that California law, where applicable, shall govern this matter, this Court holds that the allegations set forth in Kaiser's amended complaint are sufficient to state claims for relief under the California UFCA, as pled pursuant to 11 U.S.C. § 544(b), and 11 U.S.C. § 548.

Goldman Sachs further argues that, even were the California UFCA to govern this case, the complaint is otherwise deficient. As the motion to dismiss states, in pertinent part:

> Even if California's version of the UFCA applies to the transactions alleged by Kaiser, its constructive fraud provisions provide no basis for setting aside the transfers made pursuant to the LBO alleged in the complaint because Kaiser received fair consideration for the property transferred to its shareholders ...

Goldman Sachs' Motion to Dismiss, p. 2 at ¶ 5.

Again, in ruling on a motion to dismiss, this Court must accept the well-pleaded allegations of the amended complaint as true and resolve all doubts in favor of the pleader. *Miree v. DeKalb County, supra.* Within the context of said motion, the sole question before the Court is whether the facts alleged in the amended complaint, if proved at trial, would establish claims upon which relief should be granted to the Plaintiff. Referring to the recitation provided above of well-pleaded facts and allegations as contained in the amended complaint, it is clear that they do. The facts asserted in the amended complaint fit squarely within the parameters of the pertinent provisions of the California UFCA upon which Kaiser relies in bringing the First through Third Claims for Relief. Therefore, the amended complaint sets forth allegations which are sufficient on its face to sustain those claims. The issue of whether Kaiser received fair consideration as a result of the transfers at issue herein raises factual disputes which cannot be resolved as a matter of law within the context of a motion to dismiss.

Consistent with the foregoing findings of fact and conclusions of law,

IT IS THEREFORE ORDERED that the motion to dismiss filed by Goldman Sachs is denied; and

IT IS FURTHER ORDERED that all other motions adopting, incorporating by reference or otherwise joining in the Goldman Sachs motion to dismiss are similarly denied.

### ADDENDUM

1. Kaiser's four claims for relief as set forth in its amended complaint state in relevant part:

### FIRST CLAIM FOR RELIEF

¶ 22. The transfers of Kaiser's cash and preferred stock to the defendants in the 1984 LBO and the subsequent payment of dividends were without fair consideration to Kaiser.

¶ 23. The transfers to the defendants and the obligations incurred by Kaiser with respect to the preferred stock, including payment of dividends, were for less than fair consideration while Kaiser was insolvent or rendered insolvent by the 1984 LBO within the meaning of Section 4 of the Uniform Fraudulent Conveyance Act as enacted in Cal.Civil Code § 3439.04 (1985) and the common law, thereby rendering the transactions voidable to Kaiser as fraudulent conveyances.

¶ 24. By reason of the foregoing, the debtor-in-possession is entitled to judgment declaring the transfers void and requiring the defendants to transfer or convey the cash payments, dividends, and preferred stock back to plaintiff or, in the alternative, awarding damages for the value of such payments and property. The precise amount of payments and/or property transferred to each of these defendants will be proven at trial, but plaintiff currently believes that the payments were in excess of one hundred forty million dollars ($140,000,000) and that the shares of preferred stock transferred were in excess of six million shares of Series A preferred stock and six million shares of Series B preferred stock.

### SECOND CLAIM FOR RELIEF

¶ 26. The transfers and payments made to the defendants as a result of the 1984 LBO, and the subsequent payment of dividends, were made without fair consideration to Kaiser.

¶ 27. As a result of the transfers made and obligations incurred without fair consideration in the 1984 LBO, and the payment of dividends, the property remaining in the hands of Kaiser was an unreasonably small amount of capital with which to engage in business within the meaning of Section 5 of the Uniform Fraudulent Conveyance Act enacted as California Civil Code § 3439.05 (1985) and the common law, thereby rendering the transactions voidable as to Kaiser as fraudulent conveyances.

¶ 28. By reason of the foregoing, the debtor-in-possession is entitled to judgment declaring the transfers void and requiring each of defendants to retransfer the cash payments and dividends, and reconvey the preferred stock to the plaintiff or, in the alternative, to judgment awarding damages for the value of such property. The amount of said cash payments and the value of said preferred stock transfer will be proven at the time of trial, but plaintiff currently believes that the amount of cash payments was not less than one hundred forty million dollars ($140,000,000) and that the number of preferred Series A and Series B shares was not less than six million shares of each.

## THIRD CLAIM FOR RELIEF

¶ 30. The transfers of Kaiser's cash and preferred stock to the defendants in the 1984 LBO and the subsequent payment of dividends were without fair consideration.

¶ 31. At the time of the transfers described above, Kaiser knew, intended or believed that debts would be incurred in Kaiser's business beyond Kaiser's ability to repay as they matured within the meaning of Section 6 of the Uniform Fraudulent Conveyance Act enacted as California Civil Code § 3439.06 (1985) and the common law, thereby rendering the transactions voidable as to Kaiser as fraudulent conveyances.

¶ 32. By reason of the foregoing, the debtor-in-possession is entitled to judgment declaring the transfers void and requiring each of defendants to retransfer the cash payments and dividends, and to reconvey the preferred shares to plaintiff or, in the alternative, awarding damages for the value of such property.

¶ 33. The amount of said cash payments and the value of said preferred stock transfer will be proven at the time of trial, but plaintiff currently believes that the amount of cash payments was not less than one hundred forty million dollars ($140,000,000) and that the number of preferred Series A and Series B

shares was not less than six million shares of each.

## FOURTH CLAIM FOR RELIEF

¶ 35. The dividend payment of February 18, 1986 was made by Kaiser without reasonably equivalent value received in exchange. Kaiser was insolvent at the time the transfer was made, and was engaged in, and was about to be engaged in, transactions for which property remaining with the debtor was unreasonably small capital. Kaiser intended to incur, and believed that it would incur, debts that would be beyond Kaiser's ability to pay as such debts matured. The February 18, 1986 dividend payment was a fraudulent transfer and/or obligation avoidable by Kaiser pursuant to Section 548 of the Bankruptcy Code.

¶ 36. Defendant Cede & Co. and/or The Depository Trust Company and the DTC defendants were record shareholders at the time the February 1986 dividend was paid, and received funds from Kaiser in the approximate amount of three million seven hundred thousand dollars ($3,700,000). Defendant Kray & Co. and the MSTC defendants were record shareholders at the time the February dividend was paid and received funds from Kaiser in the approximate amount of one million seven hundred thousand dollars ($1,700,000). Other defendants not presently identified also received such dividends.

¶ 37. By reason of the foregoing, the debtor-in-possession is entitled to judgment against Cede & Co., The Depository Trust Company, Kray & Co., the DTC defendants and the MSTC defendants, declaring the 1986 dividends void, and requiring those defendants to repay said dividends to plaintiff or, in the alternative, awarding damages for the value of said dividends to plaintiff.

2. Cal.Civ.Code, Section 3439.04 (1985) provides:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is

made or the obligation is incurred without a fair consideration.

Cal.Civ.Code, Section 3439.05 (1985) provides:

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to actual intent.

Cal.Civ.Code, Section 3439.06 (1985) provides:

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.